```
1              IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF VIRGINIA
2                      Norfolk Division

3

4   - - - - - - - - - - - - - - - - - -
      UNITED STATES OF AMERICA,        )
5                                      )
            Plaintiff,                 )
6                                      )      CRIMINAL CASE NO.
      v.                               )         2:17cr00001
7                                      )
      LIONEL NELSON WILLIAMS,          )
8                                      )
            Defendant.                 )
9   - - - - - - - - - - - - - - - - - -

10

11                 TRANSCRIPT OF PROCEEDINGS
            TRANSCRIBED FROM COURT-PROVIDED AUDIO
12        (Initial Appearance and Detention Hearing)

13

14                      Norfolk, Virginia

15                      January 4, 2017

16

17

    BEFORE:   THE HONORABLE LAWRENCE R. LEONARD,
18            United States Magistrate Judge

19

20  APPEARANCES:

21          UNITED STATES ATTORNEY'S OFFICE
            By:  Joseph E. DePadilla
22               Assistant United States Attorney
                 Counsel for the United States
23
            FEDERAL PUBLIC DEFENDER'S OFFICE
24          By:  Keith L. Kimball
                 Assistant Federal Public Defender
25               Counsel for the Defendant
```

```
1              (The hearing commenced at 2:38 p.m.)

2              THE CLERK:  United States of America v. Lionel

3    Nelson Williams, Case 2:17cr1.

4              Are counsel ready to proceed?

5              MR. DEPADILLA:  The United States is ready.

6              Good afternoon, Your Honor.

7              THE COURT:  Good afternoon, Mr. DePadilla.

8              MR. KIMBALL:  Judge, good afternoon.  The defense is

9    ready.

10             THE COURT:  All right.  Good afternoon, Mr. Kimball.

11             There's a couple of housekeeping matters I want to

12   attend to first.  We're here initially for a preliminary

13   hearing and a detention hearing in this matter.  The

14   defendant had his initial appearance a couple of weeks ago,

15   and the preliminary and detention hearing, specifically the

16   detention hearing, was continued until today.

17             Mr. Kimball, I assume -- because the request to

18   continue the hearing was not made in open court, I assume

19   that's defendant's motion in order to give defendant

20   sufficient time to prepare for these hearings.  Is that

21   correct?

22             MR. KIMBALL:  That is correct, Judge.

23             THE COURT:  All right.  Well, ordinarily, those

24   requests outside of the five-day period should be made before

25   the Court so that the Court can determine that there is just
```

1    cause to continue the hearing, but I'll go ahead and make

2    that finding.

3            The second matter is that, as I said, it was

4    scheduled for a preliminary hearing and a detention hearing,

5    but I believe the Grand Jury has returned an indictment this

6    morning and that the indictment obviates the need for the

7    preliminary hearing.

8            Mr. Kimball, have you been provided a copy of the

9    indictment?

10           MR. KIMBALL:  I have.

11           THE COURT:  All right.  Then before we proceed to

12   the detention hearing aspect of today's proceedings, I do

13   believe it's necessary to go through an initial appearance on

14   the indictment.

15           So let me ask you, Mr. Williams, are you Lionel

16   Nelson Williams?

17           THE DEFENDANT:  Yes, sir, I am.

18           THE COURT:  All right.  Mr. Williams, this part of

19   the proceeding is called an initial appearance, and the

20   purpose of this proceeding is for the Court to advise you of

21   charges that have been brought against you and of certain

22   rights you have in connection with those charges.

23           You've been charged by an indictment from the

24   Norfolk Grand Jury with one count of attempt to provide

25   material support or resources to a designated foreign

1    terrorist organization.  In connection with those charges,

2    you have the right to an attorney and to have the Court

3    appoint an attorney for you.  If you cannot afford one, you

4    have previously been appointed representation by the Federal

5    Public Defender, and so that representation will continue.

6             In addition, you are advised you are not required to

7    make any statement, but you need to know that any statement

8    you do make can be used against you.  Do you understand that?

9             THE DEFENDANT:  Yes, sir.

10            THE COURT:  All right.  Mr. Kimball has already

11   advised that he has received a copy of the indictment, so

12   with the initial appearance then being held, Mr. Kimball, do

13   you wish to proceed and go forward on the detention hearing?

14            MR. KIMBALL:  We do, Your Honor.

15            THE COURT:  All right.  Now, correct me if I'm

16   wrong, please, but it's the Court's understanding that this

17   is a presumption case, given the charge under 2339B.

18            MR. KIMBALL:  Judge, we would agree.

19            THE COURT:  All right.  Then the way I like to

20   handle presumption cases, I'll hear from the defendant first,

21   any factual proffer you wish to make, including whether you

22   wish to call any witnesses to rebut the presumption of

23   detention, and then once you're done, then I'll hear from the

24   government their factual proffer, and then we'll have

25   argument.  All right?

1            MR. KIMBALL:  That's fine, Judge.

2            Your Honor, the Court has been provided and, I'm

3    sure, has read the Pretrial Services report, and certainly we

4    would rely on the information, the factual information, about

5        Mr. Williams in that report to rebut the presumption.

6    But, in addition to that, Your Honor, I would proffer to the

7    Court that in the Pretrial Services report it notes my

8    client's grandmother as a suitable third-party custodian.  My

9    client's grandmother is here, Your Honor, Ms. Courtney Jones.

10   She's right here.  She's raising her hand.

11           THE COURT:  All right.

12           MR. KIMBALL:  I would proffer to the Court, Your

13   Honor, that I know that Mr. Armitage has spoken with her

14   about the obligations of being a third-party custodian.  I,

15   myself, and other members of my team have also discussed that

16   with her.  She's willing to serve as a third-party custodian.

17   She's also willing to sign off on any bond that may be set.

18           In addition, Your Honor, if the Court would like a

19   little bit more assurance as far as a third-party custodian

20   is concerned, Your Honor, we would also submit to the Court

21   that my client's uncle, Mr. Doran Jones, who is also here

22   raising his right hand, has voiced his willingness to serve

23   as a third-party custodian.

24           So basic information about Mr. Jones, Your Honor:

25   He is 57 (sic) years of age, he currently works at the

1    Norfolk Naval Shipyard, he has a security clearance related
2    to his employment, he has absolutely no criminal record, and
3    he lives in Suffolk, really in a house that's on the same
4    property as my client's grandmother and my client's
5    residence.  It's the same property, and I also proffer to the
6    Court that their property, Your Honor, is in a very rural
7    part of Suffolk.
8          And I would also proffer, Your Honor, really
9    pointing out various folks that are here in support of
10   Mr. Williams.
11         We have two family friends, one Morris Evans, who is
12   here, Your Honor.  He has been a long-time family friend.
13   He's known Lionel for at least the last 14 to 15 years.
14   Mr. Victor Worrell, also a family friend, Your Honor.  He has
15   known Mr. Williams since Mr. Williams' mother passed away
16   about eight years ago.
17         Clinton Evans is here from Northern Virginia, Your
18   Honor.  He is a cousin of my client.
19         And there are three other men who are here, Judge,
20   who are friends of Mr. Williams from the Old Dominion
21   University Mosque; Ahman Mohammed, Deen Tahadi, and Keith
22   Green.  And I believe all three of those gentlemen are in the
23   back row, Your Honor.  So they're here really to show their
24   support of Mr. Williams, really to show the Court that they
25   believe he would abide by any conditions of release that this

1  Court could set.

2          So that being the proffer, Your Honor, obviously I

3  do have argument at the proper time.

4          THE COURT:  All right.  Thank you, Mr. Kimball.

5          All right, Mr. DePadilla.

6          MR. DEPADILLA:  Yes, Your Honor.  Turning to the

7  strength of the evidence in this case, the defendant put on

8  Facebook that he stands with ISIS.  Which one of the terms

9  the State Department deemed is called Dalwah, D-A-L-W-A-H,

10  so, "I stand with Dalwah" or ISIS.  The defendant gave a

11  Mirandized confession to the FBI that he stands with ISIS and

12  that he hopes they are successful.  He also stated publicly

13  that -- he posted, "I can't wait for the day that the black

14  flag of Islam exists all over Maryland, the District of

15  Columbia, Virginia, and Chicago."

16          The defendant met with an undercover who presented

17  himself as a financier for ISIS.  The financier asked him for

18  a donation to the cause.  The financier was very careful to

19  qualify that donation.  He said, "Your money is going to go

20  for the lions of Mosul," which in the terminology of ISIS are

21  the people that are fighting overseas for ISIS.  So the

22  undercover clarified, "If you give money, it is going to be

23  for this."

24          The defendant was given time to think about it.  He

25  was provided with an electronic means, whether or not he

1    wanted to make the donation.  At that point he reconnected

2    with them, made the donation.  The FBI followed up with him

3    again and sent him a digital picture of a rocket launcher and

4    other military materials and said, "This is where your money

5    went."  He texted back, "Praise God.  God is great."  And

6    then he put a smily face after it, one of those emoticons.

7    And he said, "I'm going to delete this, and I'll hit you back

8    in a minute."

9        The defendant was asked in his Mirandized interview,

10   "Did you meet with someone?"  The defendant denied he met

11   with anyone, and then when he was confronted with evidence

12   from the meet he said he couldn't comment on that.

13        The defendant donated to the cause a second time.

14   He was told, through the undercover, that the undercover was

15   overseas in the fight and they needed money for ammunition,

16   and the defendant sent them a wire transmission to cover

17   ammunition.

18        Your Honor, I would offer in Exhibit 1.  I've shown

19   it to the defense.  This is surveillance footage on the

20   Wal-Mart where he makes the monetary donation.

21        Finally, Your Honor, the defendant was contacted one

22   final time as this case was coming to its conclusion, and

23   that will make more sense when I explain the characteristics

24   of the defendant.  But he was asked one final time, "Will you

25   give more money to the cause?"  He stated something to the

1  effect of, "Yes.  I want to empty money out of my pockets
2  before I go, before I go, God willing."  And he said his plan
3  was to die without any money in his pockets.  That's coming,
4  Your Honor, in December 2016, so just a few weeks ago, when
5  the arrest was effectuated.
6        So now turning to these characteristics, he has no
7  job.  While he does have a residence with his grandmother,
8  and the uncle does live there as well, I'll address that at
9  the end.
10        He has a heavy electronic presence, communicating
11  about ISIS with people all over.  This is what he does.  He
12  regularly has videos along those lines of ISIS and the
13  beheadings and the things like that.  Mr. Williams told the
14  FBI he thinks the beheadings are the same as the electric
15  chair in America and that the killings are justified; it's
16  really just an eye-for-an-eye, it's war.
17        His characteristics include that he told the FBI
18  that he doesn't like the concept of hitting soft targets but
19  he understands the tactic.  And, so, then he was asked to
20  define, what is a soft target, and he said that was the
21  civilian population.  So then he said that hard targets are
22  soldiers, law enforcement, or U.S. Government installations,
23  and he really has no problem with those.
24        The defendant was asked straight out did he give
25  money to support terrorism.  He said, "No," and then when he

1   was confronted with the financial transaction records he said

2   he couldn't comment on that.

3         At various times he discussed with the undercover

4   martyrdom operations.  He was not concerned with doing such

5   an operation, but he wanted to make sure that his intentions

6   were pure enough if he was going to go forward with this.

7   And Mr. Williams' logic -- and he took the time to explain

8   this to the FBI -- was if you kill yourself in one of these

9   type operations and your intentions are not pure, then it's

10   just suicide.  But if your intentions are pure, then you are

11   doing it for the cause.  And what happened in December of

12   this year, beginning in the end of November, is Mr. Williams

13   told the undercover he had a plan to increase his purity;

14   that he was going to marry, via the Internet, a Muslim woman

15   in Brazil, and that if this marriage went through he would be

16   pure enough to go forth and carry on with his plan.  And he

17   said, "If the marriage goes through I shall go forth, with or

18   without.  I shall get my tools, and the next time I will see

19   my bride is in Jana," which is Heaven.  So that's what he's

20   saying to the undercover, he would not see his bride again

21   until the after life, which precipitated the probable cause

22   arrest that went forward soon after that.

23         Finally, Your Honor, when he was arrested in his

24   house was an AK47 that had one bullet in the chamber, 16

25   rounds in the mag, a nine-millimeter gun with one round in

1    the chamber and, I think it was, seven or eight rounds in the
2    magazine.  And he made a comment along the lines of, "You are
3    lucky you arrested me outside my house."  So the FBI asked,
4    "Well, what would have happened if we came into your house?"
5    And he said, "Well, if you came into my house I would
6    have," in effect, "had a gun battle with you."  And so he was
7    asked, well, what was going to happen to your grandmother --
8    who, again, Mr. Kimball has pointed out she's here today --
9    and Mr. Williams said, "She knows when to die."
10          Your Honor, as part of the FBI's due diligence they
11   interviewed the uncle and the grandmother, and we don't
12   believe they knew anything about what was going on here.
13   What the uncle said was the week before Mr. Williams was
14   walking around at night carrying his gun in his hand and
15   acting very erratically, and he said that he almost called
16   the police based on this erratic behavior.  What the
17   grandmother said was recently he's become extremely
18   disconnected from his friends and that he is always on his
19   computer and his phone.
20          So that would be the strength of the evidence and
21   the characteristics, and then I just have argument, Your
22   Honor.
23          THE COURT:  All right.  Thank you, Mr. DePadilla.
24          All right, Mr. Kimball, I'll hear any rebuttal to
25   that, and I'll hear your argument as well.

1          MR. KIMBALL:  Your Honor, I would again rely on what

2     is set forth in the Pretrial Services report and just

3     basically argue, Your Honor, ultimately with the

4     recommendation that has been put forth by the Probation

5     Office of this Court, and that is that my client should be

6     released on bond while this case is pending.

7          I've had some preliminary discussions with counsel

8     for the government, and my understanding, Your Honor, is this

9     is going to be a CIPA case, so it's not as though we're

10    looking at the typical or general pretrial detention of about

11    70 days.  I suspect that the trial, Your Honor, will be -- I

12    don't know exactly, but certainly it will be a lot longer

13    out, farther out, than 70 days from today or next week.  So I

14    think that's something that the Court can also keep in the

15    back of its mind when weighing the various factors that the

16    Court has to in deciding whether or not Mr. Williams should

17    be granted bond.

18          He has very strong family support, Your Honor.  His

19    uncle, his grandmother, his cousin is here from Northern

20    Virginia, he has a number of family friends that have known

21    him for a very long time, and he also has support from the

22    local Muslim community.

23          A sentence, Your Honor, if convicted, in this

24    particular case is not the sort of sentence that I would

25    suggest to the Court necessarily provides an incentive to

1    flee.  We do not have a mandatory minimum in this case; the

2    statutory maximum is 20 years, if convicted.  And there have

3    been a number of cases across this country where individuals

4    convicted of the very charge that Mr. Williams is facing --

5    and that is attempt to provide material support to a

6    designated foreign terrorist organization -- the range of

7    sentences on these cases, Your Honor, is pretty wide.  There

8    have been cases where the defendants have received as low as

9    probation, and certainly will have been sentences that have

10   been closer to the statutory max, but there's also been a

11   number of cases that sort of hover around that ten-year mark,

12   if you will.

13           So I would suggest to the Court that the sentence,

14   if convicted, is not something that would automatically cause

15   this young man to flee.  Especially, Your Honor, I would

16   point out that the alleged material support that he provided

17   was allegedly a total of $250.  Now, in the grand scheme of

18   things, I don't know, really, how much support that would

19   actually be providing.  And certainly, while that may be

20   important -- obviously, it's an element of the charged crime,

21   but as far as if convicted of that charge, I think the

22   degree, or the amount, or the extent of the material support

23   is certainly something that the sentencing judge will take

24   into consideration, if he's, in fact, found guilty and faces

25   sentencing for this offense.

```
1              He's a man, Your Honor, of 26 years of age.  He has

2      resided in this area -- specifically, the rural part of

3      Suffolk -- for all of his life.  He has lived with his

4      grandmother for his whole life.  His mother is deceased.  His

5      father is up in the D.C. area, but there's no real

6      relationship there, Your Honor.  He graduated from high

7      school.  He has attained a degree from a culinary arts

8      school.  And while he was not employed at the time of his

9      arrest just a few weeks ago, he was most recently employed,

10     as the Pretrial Services report notes, as a chef or cook at a

11     country club in Suffolk, and he had that job until October of

12     this year.  So he has demonstrated, Your Honor, that he can

13     hold a job.

14             In addition, Your Honor, he has, really, no criminal

15     record to speak of.  He certainly has no criminal

16     convictions.  He has a traffic conviction for improper

17     driving.  So it's not as though he has any sort of history,

18     Your Honor, that the Court would automatically assume that he

19     would not be able to abide by any conditions that this Court

20     could set.

21             Now, Mr. DePadilla, you know, proffered a good bit

22     of the evidence, alleged evidence, that they have, and

23     certainly there was a criminal complaint with an affidavit

24     that was rather detailed that perhaps the Court has seen, but

25     what you don't have is any alleged connections to actual
```

1   members of ISIS, Your Honor, or any connections in the Middle

2   East at all.

3         I would disagree with Mr. DePadilla.  I don't think

4   the weight of the evidence is that strong, Your Honor.

5   Basically, what we have here is a young man who was engaging

6   in not just legal activity, Your Honor, or lawful activity

7   but actually constitutionally protected activity.  And he was

8   engaged in those constitutionally protected actions up until

9   the time that the FBI got involved.  He's an actively

10  practicing Muslim, and we know that that's protected by the

11  First Amendment.

12        He had an AK47, but guess what?  He's not a

13  convicted felon, and he purchased it lawfully.  He wasn't

14  trying to hide that.  So then we have the Second Amendment.

15        And then apparently he was allegedly making a lot of

16  posts on Facebook and engaging in a lot of political speech,

17  religious rhetoric, but, again, that goes right back to the

18  First Amendment.  And even if that speech is unpopular,

19  perhaps disturbing to some, it is still constitutionally

20  protected speech.

21        I would submit to the Court, Your Honor, that there

22  is a strong likelihood here that Mr. Williams was entrapped,

23  and the Court knows that at this stage he is presumed

24  innocent.

25        We have, obviously, the Pretrial Services report, we

1    have what has been proffered to the Court today, and the

2    Court is guided by the Bail Reform Act.  And I'm not

3    suggesting to the Court that you would not abide by that, but

4    the Bail Reform Act sets the bar rather high, and that's

5    because our system values freedom.  And before that freedom

6    can be taken away, even at a pretrial stage, the Court knows

7    the government has to present a compelling case that there

8    are no conditions that could ensure that Mr. Williams would

9    come back to court or that he's not a threat to anybody.

10         He is presumed innocent, Your Honor.  And I know

11   that the charge here is serious.  It certainly sounds

12   scary -- excuse me, Your Honor -- sounds scary.  And,

13   naturally, perhaps in this time more than ever there may be

14   an implicit bias and fear that might naturally exist around

15   this sort of a case, but that's another reason why the Court

16   has to follow the Bail Reform Act, and when the Court does

17   that, those standards clearly call for Mr. Williams' release.

18         There's a lot of noise here, but when you get right

19   down to it all we really have is an alleged contribution of

20   $250, and I would suggest to the Court that entrapment is

21   flowing throughout this case once the FBI got involved.

22   There's no indication, there's no information known to us

23   that's been presented to the Court that Mr. Williams was

24   doing anything before the FBI got involved other than

25   enjoying those constitutional protections that every citizen

1   in this country has.

2          The Probation Office, Judge, I would submit,

3   courageously has recommended release, and we would second

4   that and ask the Court to release our client with, perhaps,

5   the conditions that Mr. Armitage has suggested, but the Court

6   can certainly impose more if the Court has some pause.  And

7   that's why I suggested my client's uncle as a potential

8   third-party custodian.

9          And I know that the FBI interviewed my client's

10  uncle and my client's grandmother, and perhaps there was some

11  alleged erratic behavior on my client's part, but, you know,

12  was that created by the FBI?  I mean, I don't know, Your

13  Honor.  It's something to think about.  But I think the key

14  point is here before they got involved was he any sort of

15  damage or a threat to anybody, and I would submit that he was

16  not, Your Honor, and I would submit that he should be

17  released.

18          THE COURT:  All right.  Mr. Kimball, what should the

19  Court make of the proffer that the government made that your

20  client was engaged in discussions discussing potential

21  martyrdom?  That's a disturbing allegation, isn't it?

22          MR. KIMBALL:  Well, it could be disturbing, Judge,

23  but just talking about something, that doesn't necessarily --

24  I mean, there's no information presented that there was an

25  actual plan in place.  Even in the affidavit in support of

1    the criminal complaint, that part of the pie was certainly

2    missing.  There was talk of it, but there was no real plan.

3    So I would submit to the Court that it was simple talk on his

4    part, bravado, if you will.  I wouldn't think it would be

5    serious, Your Honor.

6                    THE COURT:  All right.  Thank you, Mr. Kimball.

7                    Mr. DePadilla, let's hear your argument.

8                    MR. DEPADILLA:  Thank you, Your Honor.

9                    Your Honor, we're not asking you to detain him

10   because of speech, we're asking you to detain him because we

11   think he's an active danger to this community.  We're also

12   asking you to detain him because I think for another reason

13   he is a risk of flight.  He has declared that he is with this

14   organization, ISIS.  I think if tomorrow he could get over

15   there and fight with them he would go and do it, right?  Now,

16   I'm not saying that that's possible, but it certainly gives

17   him impetus to leave this community and continue to aid them

18   in any way.

19                    But primarily we're relying on danger.  He has said

20   publicly that he's loyal to these people, that he wants this

21   black flag of Islam to fly over the major cities in this

22   area.

23                    He made his intentions clear.  He was told up front,

24   this money is going for fighting, and that's what it's for.

25   They sent him a picture of a rocket launcher, and he said,

1   "Praise be to God" and sent a smily face.  That's not

2   entrapment, that's just telling you where your money is

3   going.

4          More importantly, Your Honor, I think you hit upon

5   it exactly.  The things that spun this case up in November

6   and December was his own independent plan for martyrdom.

7   There are no allegations the FBI sent him down this path,

8   because they didn't do that.  This idea was on his own; that

9   he wanted to reach this point, according to him, where he

10  could be more pure.  He was in contact with a Muslim woman in

11  Brazil, and he reported back to the undercover that when he

12  became pure enough through this marriage he was going to go

13  forth, get his tools, and the next time he would see his

14  bride would be in Jana, or in Heaven.

15         And, I'm sorry, I left this out, but of course the

16  undercover asked him at that point is it going to be local,

17  and he said, "The only way."  So now you have the FBI not

18  only looking at this generalized threat of terrorism, it's

19  now been particularized to Suffolk and Hampton Roads by this

20  defendant.

21         Mr. Kimball is absolutely right, he was legally

22  allowed to buy that AK47.  He bought it the day after the San

23  Bernardino shootings.  Coincidence?  Possibly, but when

24  someone is radicalizing over the Internet and a major

25  terrorism event happens in this country and his next decision

1   is to buy an AK47, it is going to escalate the situation that

2   much further.  Because what this man has said, not only in

3   his postings but Mirandized to the FBI, is that he believes

4   in fighting against hard targets, police, government

5   institutions, things like that, and the way you perpetuate an

6   attack against them is with an AK47.  That's the fastest way

7   to go about wreaking havoc, and that's what happened out in

8   San Bernardino.

9         But you've got even more disturbing -- not from a

10  terrorist standpoint, but just how the Court would evaluate

11  any case, right?  Because the Court regularly evaluates cases

12  where police or federal agents are making arrests.  This man

13  said, "You're lucky you didn't come into my house.  I would

14  have started shooting at you guys."  Not many people say

15  that.  Not many people -- Mr. Kimball used the word

16  "courageous" -- will admit that, "If you guys came into my

17  house as the FBI I was going to gun you down."  But also that

18  kind of shows his callousness because, you know, the FBI

19  asked, "What was going to happen to your grandma," and he

20  said, "Oh, she knows when to die."  Your Honor, the FBI tells

21  me she's approximately 80 years old.

22        A gun fight with AK47s and FBI agents can do untold

23  havoc to the people out in that location, and that's why the

24  FBI did the safe thing and arrested him on the side of the

25  road.

1          We believe the defense has not overcome the
2     presumption, and we also believe the Court can find there is
3     no conditions that will ensure that he will not be a danger
4     to this community and, to a lesser extent, would not flee and
5     go join ISIS at the drop of a hat.
6          Thank you, Your Honor.
7          THE COURT:  All right.  Thank you, Mr. DePadilla.
8          Mr. Kimball, do you wish to make any rebuttal to the
9     government's argument.
10          MR. KIMBALL:  Your Honor, just with regard to the
11     AK47.
12          I mean, the evidence is that he purchased that in
13     December of last year.  And, again, he did nothing unlawful
14     with that AK47.  Even well before the FBI got involved, which
15     I believe was in March or April of 2016, and then even after
16     they became involved with Mr. Williams, there's no
17     information that Mr. Williams did anything or even put a plan
18     together to even use that gun or any other gun, Your Honor.
19     And there are no firearms in the home, there are no computers
20     in the home.  A cell phone, of course, has been seized.  He
21     has no Internet access, and that would certainly be a
22     condition if the Court would was concerned and Mr. DePadilla
23     was concerned about a continued Internet or Facebook presence
24     or what have you.  So...
25          THE COURT:  All right.  Thank you, Mr. Kimball.

Heidi L. Jeffreys, Official Court Reporter

```
 1              All right.  Well, as the parties are aware and as
 2     Mr. Kimball has specifically pointed out, this Court is bound
 3     by the parameters of the Bail Reform Act.  And under those
 4     parameters the Court looks first at the seriousness of the
 5     charges, and obviously a charge of attempting to provide
 6     material support to a designated foreign terrorist
 7     organization, which carries with it a maximum sentence of 20
 8     years in prison, is a very serious charge.  The weight of the
 9     evidence -- this is a common theme.  The government doesn't
10     necessarily show all of its cards.  The weight of the
11     evidence here is significant; it's not necessarily
12     overwhelming.  Regardless of whether the amount of material
13     support is $250 or $250,000, that may go to the seriousness
14     of the offense, but it doesn't go to the weight of the
15     evidence.  The statute just requires that there be some
16     material support, and in this case the government has
17     proffered that they have significant evidence in that regard.
18              With respect to the third factor, which is the
19     history and characteristics of the defendant, Mr. Williams
20     obviously has the support of family.  He's lived his life
21     with his grandmother, he's a lifelong residence, he's got an
22     uncle that lives in close proximity, he has family members
23     who have appeared in his support in court, and he has friends
24     as well who appeared in support of him.  So he appears to
25     have a strong family and friends network.
```

1          While he's not employed now, he has had employment

2     in the past, and he has had both a high school and an

3     Associate of Arts education.  He doesn't appear to have the

4     assets to flee, and he has not really any criminal record to

5     speak of.  So those are elements which go in Mr. Williams'

6     favor.

7          The fourth factor that the Court looks at is the

8     risk of danger to the community posed by the defendant's

9     release.  It's an interesting argument as to the type of

10    speech that is protected by the First Amendment and whether

11    or not the Court should consider that in evaluating whether

12    that speech could translate into action that poses a danger

13    to the community.  But the government's proffer is that this

14    is more than speech that the Court has to consider.  It's

15    more than postings on the Internet that say, "I support

16    ISIS," or, "I wish there was a black flag flying over the

17    Commonwealth of Virginia."  There appears to have been

18    exchanges with an undercover FBI agent on the subject of

19    martyrdom, on the subject of killing himself in order to

20    attack hard targets; police and government facilities.

21         Certainly, someone could conduct such activity even

22    without an AK47, as we've seen in Berlin and as we've seen in

23    Nice.  Someone who is determined to risk martyrdom in order

24    to inflict harm on this country poses a risk to the

25    community; that the Court does not find there are any

1    conditions that could obviate that risk.  While it's just

2    allegations at this point, while the defendant certainly has

3    not been found guilty of any activity, certainly the proffer

4    of the government raises the substantial concern that there

5    is potential harm to the community that would be posed by the

6    defendant's release.

7             And, based on those factors, I am going to order Mr.

8    Williams' detention, and I will issue an order to that effect

9    as well.

10            All right.  Mr. DePadilla or Mr. Kimball, is there

11   anything further for the Court to consider in this case?

12            MR. DEPADILLA:  Yes.  This matter should be put

13   over to next Wednesday for normal arraignment.  That's

14   January 11th.

15            THE COURT:  All right.  Does that work for you,

16   Mr. Kimball?

17            MR. KIMBALL:  It does, Your Honor.  That's fine.

18            THE COURT:  All right.  The arraignment of the

19   defendant will take place on January 11th at 9:00 here in

20   Norfolk.

21            MR. KIMBALL:  Thank you, Your Honor.

22            THE COURT:  All right.  If there's nothing further,

23   the court will stand in recess.

24            (The hearing adjourned at 3:12 p.m.)

25

Heidi L. Jeffreys, Official Court Reporter

```
1                         CERTIFICATION

2

3          I certify that the foregoing is a correct

4    transcript, to the best of my ability, of the court's audio

5    recording of proceedings in the above-entitled matter.

6

7                              /s

8                        Heidi L. Jeffreys

9

10                       January 31, 2017

11                            Date

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```