IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

*Norfolk Division*

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) |
| | )  Criminal No. 2:17cr1 |
| LIONEL NELSON WILLIAMS, | ) |
|     a/k/a "Harun Ash-Shababi," | ) |
| | ) |
| Defendant. | ) |

## POSITION OF THE UNITED STATES WITH RESPECT TO SENTENCING

The United States of America, through its attorneys, Dana J. Boente, United States Attorney, Joseph DePadilla and Andrew Bosse, Assistant United States Attorneys, and Alicia Cook, Trial Attorney, United States Department of Justice, National Security Division, Counterterrorism Section, hereby submits its position with respect to the defendant's sentencing factors. In the Presentence Investigation Report (PSR) prepared in this matter, the United States Probation Office determined the applicable advisory guidelines range to be a restricted term of 240 months' imprisonment, the statutory maximum. That range is based on a Total Offense Level of 37 and a Criminal History Category of VI, which in the absence of the twenty-year statutory maximum applicable here would yield a guidelines range of 360 months' to life imprisonment. PSR ¶¶ 60-61. In the plea agreement, the parties agreed under Federal Rule of Criminal Procedure 11(c)(1)(C) that, upon the Court's acceptance of the plea agreement, the defendant would be sentenced to a term of 240 months' imprisonment, followed by a term of supervised release to be determined at sentencing by the Court. Docket No. 33. The parties further agreed that the Sentencing Guidelines' Terrorism Enhancement, U.S.S.G. § 3A1.4, applied to the defendant's case.

In accordance with Section 6A1.2 of the Sentencing Guidelines Manual and this Court's policy regarding sentencing, the United States represents that it has reviewed the PSR and consulted with the Probation Office and defense counsel. The government does not dispute any of the sentencing factors set forth in the PSR or the guidelines range calculation. After considering each of the 18 U.S.C. § 3553(a) factors, the PSR, the terms of the plea agreement, and the facts underlying the defendant's conviction, the United States respectfully submits that the agreed sentence of 240 months is appropriate and warranted, and that a lifetime term of supervised release should be imposed.

I.      **Background**

On December 22, 2016, the defendant was charged in a criminal complaint with attempting to provide material support to a designated foreign-terrorist organization, in violation of 18 U.S.C. § 2339B. Docket Nos. 1-2. The grand jury returned an indictment charging the same crime on January 4, 2017; it later returned a superseding indictment that included a forfeiture allegation. Docket Nos. 9, 25. The charge stemmed from the defendant's attempts to send money to individuals he believed were ISIS[1] financiers. He pleaded guilty to the single

---

[1] On October 15, 2004, the United States Secretary of State designated al-Qa'ida in Iraq ("AQI"), then known as Jam'at al Tawhid wa'al-Jihad, as a Foreign Terrorist Organization ("FTO") under Section 219 of the Immigration and Nationality Act, and as a Specially Designated Global Terrorist under section 1(b) of Executive Order 13224. On May 15, 2014, the Secretary of State amended the designation of al-Qa'ida in Iraq as a FTO under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist entity under section 1(b) of Executive Order 13224 to add the alias Islamic State of Iraq and the Levant ("ISIL") as its primary name. The Secretary also added the following aliases to the listing: the Islamic State of Iraq and al-Sham ("ISIS"), the Islamic State of Iraq and Syria ("ISIS"), ad-Dawla al-Islamiyya fi al-'Iraq wa-sh-Sham, Daesh, Dawla al Islamiya, and Al-Furqan Establishment for Media Production. Although the group has never called itself "Al-Qaeda in Iraq (AQI)," this name frequently has been used to describe it through its history. In an audio recording publicly released on June 29, 2014, ISIS announced a formal change of its name to the Islamic State ("IS"). On September 21, 2015, the Secretary added the following aliases to the ISIS listing: Islamic State, ISIL, and ISIS. To date, ISIS remains a designated FTO.

count in the superseding indictment on August 16, 2017. Docket Nos. 32-35. The Court entered a consent order of forfeiture the same day that required him to forfeit currency and various weapons and ammunition, including a Destructive Devices Industries Model 47S (AK-47) rifle, with accompanying magazines and ammunition; an S&T Motiv/Lionheart Industries Model LH9N pistol, with accompanying magazines and ammunition; a Ruger 10/22 rifle, with accompanying ammunition; certain firearms accessories; several knives; and a sword. Docket No. 36.

The defendant is scheduled to appear before this Court for sentencing at 11:00 a.m. on December 20, 2017. Docket No. 32.

## II. Position on Sentencing and Argument

"[I]n imposing a sentence after *Booker*, the district court must engage in a multi-step process. First, the court must correctly determine, after making appropriate findings of fact, the applicable guideline range." *United States v. Moreland*, 437 F.3d 424, 432 (4th Cir. 2006). "Next, the court must 'determine whether a sentence within that range serves the factors set forth in § 3553(a) and, if not, select a sentence [within statutory limits] that does serve those factors.'" *Id.* (quoting *United States v. Green*, 436 F.3d 449, 455 (4th Cir. 2006)). In making this determination,

> a sentencing court must consider "the nature and circumstances of the offense and the history and characteristics of the defendant" and the need "to reflect the seriousness of the offense," provide "just punishment," "afford adequate deterrence," "protect the public," and "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."

*United States v. Hampton*, 441 F.3d 284, 287 (4th Cir. 2006) (quoting 18 U.S.C. § 3553(a)).

      A)      <u>Nature and Circumstances of the Offense</u>

The nature and circumstances of the offense are as serious as they come. The facts recounted below were included in the Statement of Facts signed by the defendant as part of his plea agreement, and are listed in the PSR at ¶ 7. As early as 2014, the defendant began adhering to a radicalized version of Islam in which the United States and other Western nations, as well as fellow Muslims who do not share the same radical beliefs, are considered enemies. The defendant was particularly drawn to ISIS. The actions carried out by ISIS that have led to the most widespread condemnation—the lawless beheadings and other gruesome killings carried out in the name of its nihilistic ideology—were attractive to the defendant. His entrée into the world of ISIS began with his collection and sharing of videos and articles about the group. In March 2016, he publicly declared his allegiance to ISIS on a social media platform; later the same year, he discussed his desire to see "the black flags" of ISIS hanging in cities throughout the United States. In December 2015, the day after the San Bernardino terrorist attack, the defendant ordered an AK-47 rifle. When he was arrested in December 2016, the defendant was planning to use that gun in his own lone-wolf style terror attack here in the Eastern District of Virginia.

During the year between his purchase of the gun and his arrest, the defendant twice attempted to send money to a person he believed was an ISIS financier, but who was in reality an FBI undercover employee. He made his first attempted donation in October 2016, after being told specifically that the money was "going to the Islamic State" and was "going to kill." After he saw pictures of the weaponry the money purportedly had been used to buy, he responded with elation: "Alhamdulillah wa Allahu Akhbar," *i.e.*, "thank God and God is Great." The next month, he attempted a second donation of money, this time to help a purported ISIS member purchase ammunition.

In the fall of 2016, the defendant began discussing the possibility of his own "martyrdom operation." One of his concerns was the purity of his intentions—he worried that an "operation" that ended in his death would be suicide, and not martyrdom, if his intentions were impure. Around November, the defendant began an online relationship with a woman living outside the United States. By the end of the year, he came to believe that his relationship with her had sufficiently purified his intentions so that he would be able to, as he described it, "go forth" to seek martyrdom.

Early in December 2016, the defendant downloaded guidelines for carrying out terror attacks. On December 14, he asked an individual he trusted—who was actually an FBI confidential source monitoring the defendant—to buy him between 640 and 1000 rounds of ammunition, and suggested that each "kill" the defendant made might reward the source in the afterlife. He then made a second request for 500 rounds, specifically "soft points or hollows and [a] majority of [full metal jacket]." Using coded language, the defendant explained that the "[s]oft points are for thick skinned deer [and the full metal jacket rounds] are for possible trees." The defendant also conducted internet searches for a rifle sling that would allow him to carry his AK-47 hands-free, extra magazines for his handgun, different types of ammunition, and information on how to delete a hard drive.

On December 17, the defendant told the woman he had formed a relationship with that he would see her in the afterlife, and that his relationship with her purified his intentions such that his actions would be considered martyrdom, not suicide. He told several associates that if he died as a martyr, he would see his "wife" in heaven, and that she and his family would benefit from his actions in the afterlife. On December 18, he began emptying his bank account and sending money to friends; he also tried to buy another handgun. On December 19, he told an

FBI undercover employee that "I'll be going forth in'shaa'Allah," and that he needed his "wife" to be looked after once he was gone. He later clarified that his plan for a martyrdom operation involved a local attack.

The defendant was arrested on December 21, 2016. A loaded AK-47 rifle and a loaded semi-automatic handgun were found in his bedroom. After his arrest, he reiterated that he "stood with ISIS" and his belief that he was part of a "holy war." He also implied that, had the agents attempted to arrest him at his house, he would have shot them. When asked what would have happened to his elderly grandmother in that scenario, the defendant's response was that "she knows when to duck."

To the government's knowledge, the defendant has not disavowed his adherence to the radical ideology that inspired him to attempt to donate money to ISIS and then to plan his own local terror attack. He is, and will remain, an extraordinarily dangerous person. The twenty-year statutory maximum penalty is well justified here because it reflects the seriousness of the offense and provides just punishment. It also promotes deterrence and, while the defendant is incarcerated, the protection of the public. For the same reasons, the government submits that only a lifetime term of supervised release after his release adequately will protect the public from further crimes. Should the Court and the Probation Office later determine that the defendant no longer poses a threat, the term of release could be adjusted. But at the outset, given the severity of the defendant's actions and intended actions, the government's position is that only a lifetime term of supervision is appropriate.

    B)    <u>History and Characteristics of the Defendant</u>

The defendant is now 27 years old. PSR at 1. He was raised in Suffolk by his mother and maternal grandparents; he has had little contact with his biological father. PSR ¶ 36. The

defendant had a self-described "great" childhood that was marred, unfortunately, by his mother's drug addiction and ultimately by her early death, while the defendant was still in high school. PSR ¶ 36. The defendant graduated from high school in 2009 and later received an associate's degree in culinary arts from the Art Institute of Virginia Beach. PSR ¶¶ 45-46. His work history has been sporadic at best. PSR ¶¶ 47-51. The defendant has a long history of drug use, PSR ¶ 44, and physical and mental health problems as described in the PSR, *id.* ¶¶ 41, 43. Other than a juvenile arrest record related to drug and alcohol use, he has no criminal history.

The defendant, at 27 years old, is now more than three years into an unwavering adherence to a radical ideology that his arrest and conviction on significant terror-related charges has, to the government's knowledge, done nothing to alter. While the defendant faced no small share of obstacles in his life, there was plenty of good to balance out the bad, including, especially, the loving and supportive home life provided by his grandparents. How the defendant's upbringing led to a plan to end his own life while taking the lives of others, all in service to a sick and depraved ideology, is known only to the defendant. As he wrote in September 2016, the advent of ISIS "really gave my life a place and a purpose." Whatever the reasons, the defendant made the decisions he made. He has not repudiated those decisions or his desire to harm others in the name of his version of Islam. The defendant's history and characteristics further support the government's request for a lifetime term of supervised release in addition to the agreed 20 year prison sentence.

**III.     Conclusion**

Taking into account the parties' agreement regarding the appropriate sentence in this case, the Section 3553(a) factors, and the facts and circumstances discussed above, the government respectfully submits that a sentence of 240 months' imprisonment is appropriate and not greater than necessary to reflect the seriousness of the offense, protect the public, and provide just punishment and deterrence, and that a lifetime term of supervised release is warranted.

Respectfully submitted,

Dana J. Boente
United States Attorney

By:     /s/
Andrew Bosse
Joseph DePadilla
Assistant United States Attorneys
United States Attorney's Office
101 West Main Street, Suite 8000
Norfolk, VA 23510
Office Number: 757-441-6331
Facsimile Number: 757-441-6689
andrew.bosse@usdoj.gov
joe.depadilla@usdoj.gov

Alicia Cook
Trial Attorney, Counterterrorism Section
National Security Division
United States Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530
Office Number: 202-305-1601
Facsimile Number: 202-514-8714
alicia.cook2@usdoj.gov

CERTIFICATE OF SERVICE

      I HEREBY CERTIFY that on this 13th day of December, 2017, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification to all counsel of record.


      I HEREBY CERTIFY that on this 13th day of December, 2017, I sent by electronic mail a true and correct copy of the foregoing to the following:

> Leah D. Greathouse
> Senior U.S. Probation Officer
> 600 Granby Street, Suite 230
> Norfolk, VA 23510

>       /s/
> Andrew Bosse
> Assistant United States Attorney
> Attorney for the United States
> United States Attorney's Office
> 101 West Main Street, Suite 8000
> Norfolk, VA 23510
> Office Number: 757-441-6331
> Facsimile Number: 757-441-6689
> andrew.bosse@usdoj.gov